Case No. 22-1848 and 24-1704, USA v. Michael Hinds, or arguments not to exceed 15 minutes per side, Mr. Nogas, you may proceed for the appellant. Good afternoon, your honors. May it please the court. My name is J.P. Nogas. I'm an attorney at the Federal Defender's Office in the Eastern District of Michigan, and I represent Appellant Defendant Michael Hinds. The first issue I'd like to discuss is the Brady violation, because I think there's something that I didn't make clear enough in my briefing. I would like to focus the court on two different contradictory statements that were made by the prosecutor in this case, first during jury deliberations in March of 2022, and then subsequently two years later during the Brady violation hearing in February of 2024. At trial, the prosecutor told the judge to tell the jury, in response to their question, that the reason that Officer Bush did not testify was because his testimony would be cumulative. But two years later, when confronted with the same question by the district court, the district court asked the same prosecutor, did you choose not to call Bush because of the baggage that he had? And she said, yes, that is correct. And so that means that the truth was deliberately misrepresented to the jury in response to their question. And that leads to the question, how could that not undermine confidence in their verdict? Because that's the standard here, right? We're talking about the Strickler standard. It's not Strickland. We don't need to prove that the outcome would have been different. We just have to look to see if it undermines confidence. And it does that in two ways. First of all, when the jury question came up, the defense and the judge were angling towards an adverse inference instruction. The government objected to that and said, no, hold on. We didn't call this witness because we don't believe his testimony would elucidate anything more about the transaction than the other witnesses already would. The defense still argued for the adverse inference, but the judge went with the prosecution's account and told the jury the prosecution believes that this testimony would have been cumulative. What would have happened if the prosecutor had told the truth and said we didn't call him because he has a disciplinary record for lying? Just to make sure I understand, it's basically just one statement that the officers gave that was a hearsay statement from Bush that's at issue? No, Your Honor. So that was the only issue in terms of the cumulative nature of the other officer who testified. Because that officer observed the search of my client's person, but did not observe the initial viewing that Officer Bush said he made of the money. So that is an issue of hearsay. However, there's also this issue that the defense attorney raised in his arguments. He raised a question about the validity and the credibility of the drug evidence in the case. In fact, he had asked the court for permission to reexamine the heroin evidence that was not actually used in the case. The court denied that on the basis that that's not material to this. But had the court known and had the defense attorney known that this officer who handled that evidence had a history of covering up things and investigations that did not go according to procedure, it's very possible that the court would have reconsidered that decision. The court had the post-trial hearing on Brady and gave us this ruling. So the court did, I guess, assess whether this was going to be material or not. So it was a different district judge, but nonetheless. That's the ruling we're reviewing. Right, that's the ruling we're looking at. And I note that although the district court denied our Brady motion, he did say that this nondisclosure was ethically questionable. Right, and so was that ruling legally wrong, I guess? And so I'm curious about this materiality point. How would the proceeding have been different? You said it undermines confidence in the verdict. So the district judge at the time said, I'm thinking of giving an adverse inference instruction in response to this question. If the government had said, we didn't call him because of his baggage, it most likely means that that adverse inference instruction would have been given. This is an interesting argument. So you're basically saying the instructions after the proof all came in would have been different.  I guess I thought we should review the totality of the evidence presented, and I guess I'll leave it at that. I mean, isn't that really the focus of the inquiry? Yes, but the totality of the evidence that was presented to that jury still led that jury during deliberations to come back and say, why didn't we hear from this officer? Is it reasonable for us to ask? Clearly they were thinking something was odd. I understand, but we have to kind of look at what was presented, right? And so we have Harfunich's testimony and evidence and all of the evidence that came in through that officer, and I guess didn't he really provide most of the incriminatory evidence? He provided the evidence as to the finding of the drugs, but as to the money, which the government used as evidence that this was clearly evidence that this person was a trafficker, that came through the other witness hearsay of Officer Bush. So the theory is, how would you have handled trial differently if this had been disclosed? Right. Well, let me answer that in two parts. So obviously if it had been disclosed earlier before trial had started, then I, and I believe the trial attorney as well, would have reopened, asked the court to reconsider its ruling on the suppression motion. The court denied the suppression motion over the recommendation of the magistrate. So we know it was already a closed question. What would you have done differently at trial? I'm sorry? What would you have done differently at trial? It's clear, it's not speculative, that the trial attorney presented evidence tampering theory to the jury. Now, based on the evidence that was presented to the jury at the time, the jury evidently didn't buy that theory, but had he had the ability to convince the court to allow him to reexamine the drug evidence, we don't know what he would have found. He may have found something there that enabled him to bolster the tampering. More than just calling Officer Bush insane. Potentially, yes. Did you tamper with evidence? He says no. Well, wait a second. You're a liar because of this prior report. Right. Because there might have been actual additional evidence that was present in the heroin that was. It might have been. But you have no evidence. You have no evidence whatsoever that there was any tampering or anything done incorrectly. No, Your Honor. And the government and the district court both said this theory is far-fetched. The thing is, our argument is that wasn't their determination to make. The question is whether or not it would have raised reasonable doubts for the jury. And the jury didn't have the opportunity to consider that because the jury was told there's nothing to see here. Yes, but you would have had to supplement it with something. I mean, there's nothing to supplement. It's just he had one other case where he did something different. He didn't tamper with drugs. He didn't turn on his flashers, right? Right. He didn't turn on his flashers because he thought that would prevent the cameras from rolling because it was an unlawful pursuit, a high-speed pursuit, which led to the death of a civilian. But there's just nothing else. I hear your point, but there's just literally nothing else to confirm that there was wrongdoing in this case. No, but, again, the defense attorney attempted to investigate that through the examination of the evidence, which the court denied, not knowing this about Officer Bush, and I think that makes a difference. There's a second reason, though, that this undermines confidence in the verdict, and that is because making this disclosure after the close of evidence, after the arguments, during deliberations, if that had happened, any competent trial attorney would have immediately moved for mistrial because they would have said the jury was not told about this. This would have changed the way we presented the evidence. Is that an effective assistance point? I'm sorry? Is that an effective assistance point? Well, no, because he didn't know about it. Okay, I'm sorry. I'm saying if it had been disclosed to him during deliberations, if the prosecutor had told the truth, we didn't call this guy because he has a disciplinary record. That trial attorney would have moved for distrial. I mean, how would the analysis have differed from what the district court eventually did? I understand it's a different district judge. Your Honor, again, the question isn't whether or not the result would have been different. Sure. It's whether or not it undermines our confidence, and I think it does undermine our confidence. We don't know for sure what the district court would have done. Well, we have a ruling on the Brady issue post-trial. I want to hear about the ACCA argument.  I just kind of wanted you to be able to address, you know, just how many priors under the ACCA exist here because it seems like you would have to concede there's a 2001 robbery, so you've got one. Okay. And you're saying the other three that are at issue would kind of morph into one or at least the government can't meet its burden that it's harmless beyond a reasonable time. Right. So in order to prevail, we need to persuade you that a reasonable jury could find that that 10-month span covering those three trafficking convictions could plausibly be considered consistent with a single occasion by a jury. And the easiest way to do that is to look at the way that juries have considered these kind of issues post-Erlinger. And so I cite to the Pennington case from the Northern District of Georgia. That gets a little speculative to me to, you know, wonder what a jury might say. We now have, by my count, four, if I've lost count, someone can correct me, published decisions, you know, addressing these types of claims, two that have sent it back and two that have affirmed. And so I guess why is yours more like the ones, you know, where we should send it back? Mr. Hines' case is more akin to Cogdill and Kimbrough for two main reasons. First of all, the issue of physical proximity. So the government has made much of the fact that the three prior convictions for Mr. Hines occurred in three different cities in southeastern Detroit. However, those three cities are neighboring each other and they actually come together in one point. And as the court said in Cogdill, it can't be clear from the record whether or not multiple offenses happened in the exact same place. That's entirely possible from the record here because the fact that they were prosecuted in different jurisdictions has more to do with the imaginary line that divides these three neighboring cities than it does with the idea that they're far apart. Compare that with Campbell where one of the convictions was in Chattanooga and the other was in Norfolk, Virginia, which were 800 miles apart as the crow flies. I mean, that's a huge difference. The other thing is regarding the drugs, and I see that I'm about to expire. The first conviction for Mr. Hines was a conviction for cocaine. The second was one for heroin. The third was one for cocaine. However, what the record shows is that the first and third also had allegations that he possessed other drugs as well. The Detroit case involved cocaine and heroin. The East Point case involved cocaine and marijuana, and we know that the Instant case involved cocaine, marijuana, and heroin, even though Mr. Hines was only convicted of one of those. So there is a similarity in terms of the MO in all of these and the potential source of drugs that makes it more akin. Similar MO, similarly close cities, not the same city. That's enough to prove an occasion even if they're 10 months apart. It's an intense factual question that should be presented to a jury. I guess just to first principles, this is not the events that are somewhat proximately related clause. It's the occasions clause. You're telling me that 12 people could decide that something that happened, two things that happened 10 months apart, that have some similarities but not all similarities, fell on the same occasion. We know that that's already happened, Your Honor. It's not speculative to say that that kind of decision was already made by a jury in Pennington where the offenses were eight years apart and, for what it's worth, occurred in two different counties and did not involve the exact same instance. Is that consistent with the understanding of the word occasion? I mean, that's the word used in ACCA. So that seems to me that has to be our starting point. Respectfully, Your Honor, I know that you went into that in your opinion in Kimbrough. I won't relitigate the whole thing here, but just from first principles, the word is occasion that we're supposed to be using. It's morphed into this can things be related, some similar, you know, do crimes have similarities clause rather than occasions clause? I think the issue is, Your Honor, is that we don't need to do in a statutory interpretation anymore because the court in Erlinger stated there is no particular lapse of time that delineates a single occasion from separate occasions. So the Supreme Court has already said that separation of time is not the only thing that you have to look at. Did you object below or do you now to the PSR's characterization of these prior convictions? I believe that the defense attorney at the time objected to it not being presented to a jury and argued that there could be a basis for a jury to find otherwise. Yeah, different question. What I'm asking is, you know, there's no objection that he was arrested on July 22, 2015. Oh, no, Your Honor. We can see the arrest prosecution dates. What's missing from the record is the details of what particular drugs may have been involved in the military. Thank you. Could you take just a moment to address our recent decision in Whitlow and whether that would, you know, control our decision on whether federal law would support probable cause here? So Whitlow makes it harder for us, no doubt. But I do think that Whitlow's analysis in looking at whether federal law is silent on the issue is germane to this case and makes this case distinguishable because federal law does say something about this. Because every appropriations bill that has come out since 2013, including the one that was in effect at the time of the arrest, said that the DOJ funds cannot be used to interfere with state marijuana law implementation. And Michigan was on the list of states that they weren't allowed to do that for. So we know that federal agents would not have been able to do this, right, because they would become under the DOJ funding. What is not established in the record, because Whitlow came out after our briefing, is whether or not these Detroit Police Department task force members themselves had funding from the DOJ. If they did, I think that means that federal law is clear, that they should not have been able to do it. That's not, that's just not in the record. Thank you. Thank you very much. We'll hear from the Governor. Good afternoon, Your Honors. May it please the Court, Megan Bean from the United States. This Court should affirm the District Court's judgment in order denying the motion for new trial. I'll start where we left off on Whitlow and with a response regarding the Appropriations Act. Whitlow discussed these exact Appropriations Act in footnote two and explained why they didn't matter for purposes of a state officer, which is what we have here conducting a marijuana-based search. And that footnote two says that federal legislation doesn't prescribe the search here because, for one, it prohibits DOJ from using federal funds, but it doesn't limit the enforcement authority of a state official. There's nothing in the record that says the DPD officers here were task force officers. They were Detroit police officers. There were no DOJ funds used related to this search. And the second is that Whitlow's federal prosecution, like Hines', is for an altogether different offense, being a felon in possession of a firearm. It's not a marijuana prosecution. So Whitlow directly addressed and rejected, in fact, Mr. Hines' argument, trying to say why federal law prohibited the search. Those Appropriations Act didn't do that. Turning to the Erlanger issue, again, as your honors have said, there are four published decisions, and I think the court needs to look at whether this looks more like Campbell and Robinson or Cogdill and Kimbrough. In this case, it looks most like Campbell. There, just like Mr. Hines, Campbell had four ACCA predicates, and he didn't dispute that the first happened on a different occasion. The next three in Campbell were drug convictions, and they spanned, by my count, about seven months. Here we have a 10-month span. But it's not just the span of time between the offenses that matter here. What my friend on the other side did not include is that there were also intervening arrests. And, in fact, Mr. Hines was arrested, convicted, and sentenced for his first of the three drug offenses before he committed the next two. So, I mean, it's under every wooden factor Mr. Hines' three drug offenses were committed on occasions different from one another. It's not just the time. It's not just the proximity. It's not just the relationship to each other. He actually, under all three of those factors, it's clear that he committed them on separate occasions. Your friend on the other side says that Erlinger comes after wooden and maybe displaces it. And Erlinger says there's no time test. It's sort of unlimited. So how do you respond to that? Well, Erlinger did not say that. I think Erlinger said look to the wooden factors. And, sure, some, like Cogdill, right, may be harder because there's less information. So time can't be dispositive always. Sometimes time might be dispositive. Here we're not just looking at time. We're looking at all three. And under all three it's clear that these were different occasions. And I think this court, you know, to address Mr. Noges' argument about other jury verdicts, in Campbell the majority said that if only a theoretical possibility of acquittal were enough to show harmlessness, then harmless error couldn't exist. And here what we're looking at is whether a reasonable jury, what a reasonable jury would have found. And under all three factors, both that this court has applied in its recent published decisions and that the Supreme Court set out in Wooded, this was clearly harmless beyond a reasonable doubt. Turning to the Brady issue, I think this court addressed the issue clearly. And that's the court did not abuse its discretion when it denied the motion for a new trial because Hines has not shown that the undisclosed information was material. And there's several problems with his argument. I think, Judge Ritz, you said don't we look at the totality of evidence here in favor of his conviction. And both the Supreme Court and this court has said that you do. You can say that the undisclosed information did not undermine confidence in the verdict here because there was overwhelming, I think the district court called it a whole constellation of evidence, supporting Hines' conviction. That's 159 grams of crack at his feet, including in a vial with his name on it. In that same bag there's a loaded stolen gun. It's his mom's car that she rented. He admits in post-Miranda statements that he knows information about the robbery where the gun was stolen. Not just the name of the place where it was stolen, but the circumstances surrounding the robbery. And this came in through testimony of two officers who were there. The encounter was completely captured on body camera. So for all the court's questions, I haven't clearly heard Mr. Noges explain how this information would have been used to undermine confidence in the verdict when you look at what the district court called a whole constellation of evidence supporting the conviction. How do you address his point about this tension between saying the testimony would be cumulative versus saying, well, we didn't call him because he had baggage? So I think that to understand that back and forth on how the jury, the question was answered, the court needs to look at the discussion between the parties in the court. So what happened was the jury asked the question. The court on its own suggested, well, maybe I should give a missing witness instruction. Hines' counsel was not the one who proposed it. The government objected and said, under both prongs of what you're supposed to look at to give a missing witness instruction, that wouldn't be proper here. The prongs are, would the testimony have been cumulative? And the answer is, yes, it surely would have been cumulative of the other officer's testimony. And second, was it only in the government's ability to call Officer Bush? And the answer is no, defense counsel could have called Officer Bush himself. So under both prongs, the missing witness instruction was not proper. And the court on its own said, okay, I'm going to tell the jury that the information would have been cumulative. So it wasn't the government who suggested it. It came out in the context of discussing whether a missing witness instruction was proper. Your point about how the defense could have called Bush himself, I'm guessing the response from the other side would be, we didn't know that we would need to. We didn't know there was any information out there. Sure, but I guess the question by the jury, I guess, again, I don't understand how it shows that the nondisclosure undermined confidence in the verdict. Even if this information had been disclosed, defense counsel admitted on page 3326 at the hearing on the motion for new trial, the answer was never going to be, oh, he was disciplined in another case, so we couldn't call him. That would not have been the answer, and counsel admitted that at the hearing. So short of that, I guess I'm just not clear what the answer, they're proposing the answer should have been or why that would have changed anything. Because the court went through the missing witness instruction analysis and found that it wouldn't be properly given because it failed to meet both prongs for a proper missing witness instruction. So I guess I just, again, kind of failed to understand that argument, especially in light of the fact that counsel said, sure, we understand we wouldn't have just told the jury he was disciplined. That would have never happened. So, you know, I think the point is the jury was curious. They asked the question, but Bush didn't testify and they convicted anyway. So it does show that Bush's testimony was unnecessary to, you know, to convict Hines. Is y'all's position that, I was looking at your brief and you write, obviously it's a compelling point in your favor that Bush was a non-testifying, you know, he didn't testify. So, you know, what are we talking about here? But is it your position that if a witness doesn't testify, then period, the Brady-Giglio inquiry is over at that point? I mean, could Brady or Giglio apply even to a non-testifying? I think Brady certainly could, and the Supreme Court has said as much, right, in the Kiles case. But the question under Brady is whether the information is exculpatory. And nothing about Officer Bush's prior discipline cleared Mr. Hines here. Giglio, I mean, this court has said in the Seymour case that we cite in our brief, there is no obligation for the government to disclose impeachment information for a non-testifying witness. That's what we have here. So certainly Brady could apply, but in this case, it did not. If you had a witness that did have a history of tampering with evidence, and that was the prior misconduct at issue, I guess that could be exculpatory. It depends on the circumstances. Yes, perhaps under the circumstances, but here Officer Bush was never disciplined for tampering with evidence. Unless the court has further questions, I would ask that it affirm the district court. Thank you. Your rebuttal. So the footnote in Whitlow, Your Honors, actually is very clear about why that appropriations language didn't apply to Whitlow. And in its text there shows how it would be differently applied to Mr. Hines' case. I mean, it says the DOJ's decision to spend funds on that prosecution doesn't prevent Ohio from implementing its medical marijuana regime because Ohio wasn't on the list. It doesn't limit the enforcement authority of state officers like Officer Casimir. What this doesn't address, again, is whether or not – I think it's slightly incorrect in saying that it only prohibits the DOJ from using federal funds. Actually, if you look at the language of the appropriations bill, it prohibits the funds given to the DOJ from being used. So the DOJ also, if it funds local law enforcement, which we know they do, that those funds couldn't be used for this also. So I do think that the distinction remains as to that. I think the government's correct. There isn't a record of whether or not it was tasked for. Say I misspoke. They were special ops. They were a special ops unit. Again, unclear whether or not they received DOJ funding or not. It probably is a noticeable fact that the DPD receives federal funds, but again, that wasn't developed in the record. As to the Erlinger issue, I would note that the fact that my client was prosecuted, convicted, and sentenced on one case before the other, again, the issue is we don't know the details about whether or not those cases occurred in such proximity and in such similar manner that had they occurred in the same jurisdiction, and again, they could have happened in basically the same place, the same intersection, that they wouldn't otherwise meet the Erlinger analysis of the wooden factors. Remember, as to timing, that Cogdill was a three-month gap, so to Your Honor's point about doesn't a single occasion, doesn't it relate more to a single day, I mean this court has already established precedent that 90 days doesn't necessarily mean separate occasions. Now, this is 10 months. It's longer, but again, in that context of looking at other cases that juries have decided on, I think that that's relevant. Cogdill was the same drug, too, though, and here we have cocaine and heroin. Am I right? Right, but we have cocaine and heroin, right? It's not, again, these are cocaine convictions, but the allegations in those cases originally included charges of other drugs as well. It's just what he ended up getting convicted of was the cocaine and the heroin in two different cases, but the question is did he have all those drugs on him, which would make it quite similar. To contrast with either Robinson or Campbell, I think it was Robinson, there was two trafficking convictions, but one was for heroin and one was for hydrocodone, which have entirely different client-customer bases, basically. They weren't a similar kind of drug, whereas in this case it's clear that Mr. Hines always has, or when he's caught with these things, often or always has all of these drugs to sell to people. As to the Brady issue, I just wanted to correct something. Not everything was captured on body cam. That was one of our arguments, that Officer Bush did not activate his body cam until the search of the pants was starting, so that whole portion of what did he see before then, did my client secret it away, that is not on body cam. Okay, thank you. Time is up. Thank you for your advocacy, and the case will be submitted.